NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

METRO–TRUCK BODY, INC., Respondent.

No. 77–3172.

United States Court of Appeals, Ninth Circuit.

Dec. 28, 1979.

Rehearing Denied Feb. 25, 1980.

Elliott Moore, Washington, D.C., on brief, for petitioner.

**748**

Francis J. O'Neill, Los Angeles, Cal., on brief, for respondent.

Before WALLACE and ANDERSON, Circuit Judges, and PALMIERI,* District Judge.

WALLACE, Circuit Judge:

The National Labor Relations Board (NLRB) found Metro Truck Body, Inc. (Metro) guilty of violating section 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq., and now seeks to enforce, pursuant to section 10(e) of the NLRA, 29 U.S.C. § 160(e), the cease and desist order it issued against Metro on June 14, 1977. In response, Metro contends that the election and subsequent certification of the Automobile Employees, Laundry Drivers & Helpers Local 88, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Union) is not supported by substantial evidence in the record as a whole, that the NLRB erred in ordering the election when the Union had not adequately shown that a "substantial number of employees" favored Union representation, and that the NLRB's denial of an election objection hearing violated Metro's right to due process of law. We reject Metro's contentions and enforce the order.

In March of 1975, the Union filed a representation petition with the NLRB. The representation hearing was delayed until July 1976 pending resolution of certain unfair labor practice charges filed by the Union. The Regional Director of the NLRB ordered the election to be held September 1, 1976, and on that date 22 ballots were cast, 13 in favor of and 9 in opposition to the Union. One week later Metro filed the objections to the election. In response, the Regional Director conducted an administrative investigation which resulted in rejection of the objections and certification of the Union as the exclusive bargaining representative of Metro's employees. Beginning in October 1976, the Union requested Metro to recognize and bargain with it and Metro has continually refused. The NLRB issued a charge in February 1977 alleging violations of section 8(a)(1) and (5) of the NLRA. The company's response admitted its refusal to bargain but claimed, as an affirmative defense, that the certification of the Union was invalid. On June 14, 1977, the NLRB, without hearing, granted a motion for summary judgment against Metro and has now applied to this court for enforcement of the consequent order.

"It is well established that 'Congress has entrusted the [NLRB] with a wide discretion in conducting and supervising elections.'" NLRB v. Sauk Valley Mfg. Co., 486 F.2d 1127, 1130 (9th Cir. 1973) (quoting NLRB v. W. S. Hatch Co., 474 F.2d 558, 561 (9th Cir. 1973)); e. g., NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946). Therefore, our review of NLRB supervision of election proceedings and accompanying orders is limited. NLRB v. Tri-City Linen Supply, 579 F.2d 51, 55 (9th Cir. 1978); Coronet-Western v. NLRB, 518 F.2d 31, 32 (9th Cir. 1975) (per curiam); NLRB v. Sauk Valley Mfg. Co., supra, 486 F.2d at 1130. "'If the findings of the [NLRB] are supported by substantial evidence on the record considered as a whole, they are conclusive; and so long as the [NLRB] did not misapply the law, the order is to be affirmed.'" NLRB v. Pacific Int'l Rice Mills, Inc., 594 F.2d 1323, 1325 (9th Cir. 1979) (quoting NLRB v. Heath Tec. Division/San Francisco, 566 F.2d 1367, 1369 (9th Cir.), cert. denied, 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978)); NLRA § 10(e), 29 U.S.C. § 160(e).

**I.**

Metro employs both English-speaking and Spanish-speaking personnel.

---

* Honorable Edmund L. Palmieri, United States District Judge, Southern District of New York, sitting by designation.

As a result, the ballot for the September 1, 1976 election instructed the employees, in English and Spanish, to mark an X in the box labeled "YES–SI" if they favored Union representation, or in the box labeled "NO–NO" if they did not. On two of the ballots, employees wrote the word "si" in the "YES–SI" box rather than marking the ballot with an X. Because the Spanish word for "yes" is written "si" with an accent mark over the i, and the Spanish word for "if" is written "si" with a dot over the i, Metro contends that the accentless markings on the two ballots were ambiguous and that the ballots were, therefore, void. "It is well established, however, that in representative elections, the [NLRB] will count all ballots where the voter's intent has been *clearly manifested*, even if the voter has not followed the proper designation procedure, provided that the mode of designation does not reveal the voter's identity." *NLRB v. Sauk Valley Mfg. Co., supra*, 486 F.2d at 1133 (emphasis added). *E. g., NLRB v. Tobacco Processors, Inc.*, 456 F.2d 248 (4th Cir. 1972) (per curiam); *NLRB v. Titche-Goettinger Co.*, 433 F.2d 1045, 1048 (5th Cir. 1970); *NLRB v. Whitinsville Spinning Ring Co.*, 199 F.2d 585, 588 (1st Cir. 1952). Therefore, "the fundamental question in counting any ballot is for whom or for what did the voter who cast the ballot intend it to be counted . . . ." *Id.* at 587.

■ In this case, we have no doubt that the persons who marked the two ballots in question intended to vote in favor of the Union. The fact that "si" was placed in the "YES–SI" box rather than the "NO–NO" box indicates an affirmative response to the question that was asked both in English and in Spanish. In addition, the response was consistent with the ballot itself because the word "SI," as it appeared above the "YES–SI" box, was also not punctuated with an accent mark. We agree with the conclusion of the Regional Director that the word "si," if interpreted as "if," as Metro contends, would be a meaningless *non sequitur* in the text of the ballot. Support of unionization was "clearly manifested" by the challenged ballots and the NLRB properly counted them as votes in favor of Union representation.

■ Metro also contends that the two ballots should be voided because they reveal the identity of the voter. This argument would have merit if only two of Metro's 22 voting employees spoke Spanish. It clearly has no merit, however, in the facts of this case: 15 of Metro's 22 employees were Spanish-speaking.

## II.

Section 9(c)(1)(A) of the NLRA, 29 U.S.C. § 159(c)(1)(A), states that the NLRB shall investigate a petition and may order an election, "[w]henever a petition shall have been filed . . . alleging that a *substantial number of employees* (i) wish to be represented for collective bargaining" by the union. (Emphasis added.) As a rule of thumb, the NLRB normally investigates only those petitions which indicate that the union is supported by at least 30 percent of a company's employees. In this case, the initial petition revealed authorization card support in excess of that requirement. However, because eight of the employees who signed authorization cards were subsequently discharged by Metro as illegal aliens in the United States, Metro claims that the Union did not have the requisite 30 percent support among employees at the time of the NLRB representation investigation. Thus, according to Metro, the NLRB lacked jurisdiction to investigate the petition and order an election.

■ We disagree. The section 9(c)(1)(A) substantial interest requirement is not a jurisdictional prerequisite to NLRB action as Metro contends. Rather, it is an "administrative expedient[] only, adopted to enable the [NLRB] to determine for itself whether or not further proceedings are warranted, and to avoid needless dissipation of the Government's time, effort and funds" through investigation of frivolous petitions. *In re O. P. Jennings & Co.*, 68 N.L.R.B. 516, 517–18 (1946), *quoted in NLRB v. J. I. Case Co.*, 201 F.2d 597, 599 n. 3 (9th Cir. 1953). Were the NLRB unable to require a substantial interest on the part of the target

company's employees before commencing an investigation, it would be forced to investigate every representation petition filed by a union, regardless of the actual chances of that petition's success. To avoid such waste, Congress created the substantial interest requirement, thereby preserving the NLRB policy of investigating only those petitions that the NLRB determined to be of substance.[1]

■ When this screening purpose of the section 9(c)(1)(A) substantial interest requirement is understood, it logically follows that there is no purpose in permitting the parties to litigate the adequacy of a union showing of substantial interest. That requirement exists simply to aid the NLRB in focusing only upon meaningful representation petitions. If the ensuing investigation reveals a "reasonable cause to believe that a question of representation affecting commerce exists," the NLRB is required to hold a hearing in which, "[i]f the [NLRB] finds . . . [that] a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof." 29 U.S.C. § 159(c)(1). The question of union support is conclusively decided by the representation hearing and the actu-

al secret ballot election. There is no need to litigate its existence at the initial petition stage.[2] Those circuits which have considered this issue agree. *E. g., Intertype Co. v. NLRB*, 401 F.2d 41, 43 (4th Cir. 1968), *cert. denied*, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969); *NLRB v. Louisville Chair Co.*, 385 F.2d 922, 926–27 (6th Cir. 1967), *cert. denied*, 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163 (1968); *NLRB v. National Truck Rental Co.*, 99 U.S.App.D.C. 259, 261–62, 239 F.2d 422, 424–25 (D.C. Cir. 1956), *cert. denied*, 352 U.S. 1016, 77 S.Ct. 561, 1 L.Ed.2d 547(1957); *Kearney & Trecker Corp. v. NLRB*, 209 F.2d 782, 787–88 (7th Cir. 1953); *NLRB v. White Constr. & Engineering Co.*, 204 F.2d 950, 953 (5th Cir. 1953). *See also Goodyear Tire & Rubber Co.*, 138 N.L.R.B. 453 (1962).

### III.

Throughout the lengthy history of this case, Metro was never given a full evidentiary hearing about its objections to the election: that the two improperly marked ballots should have been voided, that the Union's initial showing of substantial interest was inadequate, and that the Union created a racially inflammatory environ-

---

1. As originally enacted, the NLRA contained no substantial interest requirement. Section 9(c) stated:

   > Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section 10 or otherwise, and may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives.

   National Labor Relations Act, Pub.L.No. 74–198, § 9(c), 49 Stat. 449 (1935).

   In the years following enactment of this language, however, the NLRB adopted a policy of investigating only those representation petitions that were supported by a showing of substantial interest among employees of the target company. *NLRB v. J. I. Case Co.*, 201 F.2d 597, 598 (9th Cir. 1953). When the current section 9(c)(1)(A) language was adopted, requiring allegations that "a substantial number of employees . . . wish to be repre-

   sented" by the union, Congress made it clear that it did not intend to affect those NLRB "rules of decisions with respect to dismissal of petitions by reason of inadequate showing of representation . . . ." S.Rep.No. 105, 80th Cong., 1st Sess. 25 (1947), *reprinted in* I NLRB, Legislative History of the Labor Management Relations Act, 1947, at 431 (1948).

2. Metro incorrectly contends that this nonlitigability rule is based upon a single interest: the desire to maintain the confidentiality of those employees who have expressly favored unionization in advance of an actual election. Because the identity of all Metro employees who signed authorization cards was previously revealed at an NLRB unfair labor practice hearing, Metro contends that, absent the sole confidentiality interest protected by the nonlitigability rule, it should be permitted to litigate the adequacy of the Union showing of substantial interest. However, as stated above, the nonlitigability rule derives from the nature of the substantial interest rule as an administrative expedient, not solely from a desire to protect the confidentiality of preelection union supporters.

ment in which a fair election was impossible. Metro claims that the denial of such a hearing violated its right to due process of law.

"It is well established that a hearing is not required in every case to determine the validity of objections to a Board-conducted election . . . ." *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 33 (5th Cir. 1969), *quoted in NLRB v. Sauk Valley Mfg. Co., supra*, 486 F.2d at 1133.

As we have consistently explained, in order to obtain a hearing on an election objection, "the objecting party must supply prima facie evidence, 'presenting substantial and material factual issues' which would warrant setting aside the election." . . . Thus, if the objector fails to proffer specific evidence which would constitute a prima facie showing of its contentions, or if those contentions, even if true, would not warrant setting aside the election, then the Board need not grant an administrative hearing.

*Natter Manufacturing Corp. v. NLRB*, 580 F.2d 948, 951 (9th Cir. 1978), *cert. denied*, 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979), *quoting NLRB v. L. D. McFarland Co.*, 572 F.2d 256, 261 (9th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 257 (1978) (citations omitted).

Our examination of Metro's three objections to the election causes us to conclude that Metro's right to due process was not violated by denial of a hearing. Metro's contention that the two improperly marked ballots should have been voided would have had, as we have seen, no impact upon the outcome of the election because the ballots, though improperly marked, clearly manifested a desire for Union representation. Nor would Metro's substantial interest contention have altered the election's validity; it would not have been litigable even if a hearing had been permitted. Metro's final objection to the election, that Union actions created a racially inflammatory atmosphere preclusive of a fair election, was supported by no evidence produced by Metro. "[T]he party challenging the election carries a heavy burden in charging that coercion pre-

vented a fair election, for evidence must be furnished overcoming the presumption that ballots cast under the safeguards provided by Board procedure reflect the true desires of the participating employees." *Valley Rock Products, Inc. v. N.L.R.B.*, 590 F.2d 300, 302 (9th Cir. 1979). In failing to produce any evidence at all in support of its racial inflammation contention, Metro fails to "supply *prima facie* evidence presenting substantial and material factual issues which would warrant setting aside the election." *Id.* Metro was not entitled to a hearing on the racial inflammation issue or on any other of its election objections. Metro was not denied due process of law.

ORDER ENFORCED.